

NUMBER 13-09-00105-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG

MARIBEL REYES,                                                                    Appellant,

v.

LUIS REYES III,                                                                   Appellee.

On appeal from the 92nd District Court
of Hidalgo County, Texas.

MEMORANDUM OPINION

Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Chief Justice Valdez

Appellant, Maribel Reyes, challenges the trial court's final decree of divorce. By four issues, Maribel contends that: (1) the trial court abused its discretion by dividing the marital estate disproportionately in favor of appellee, Luis Reyes III; (2) the trial court erred in setting child support; (3) the trial court abused its discretion in ordering the

child possession order; and (4) the trial court abused its discretion in setting a geographic restriction. We reverse and remand, in part, and affirm, in part.

## I. BACKGROUND

Maribel and Luis were married on April 21, 1990, and had their only child on December 16, 1999. In 2001, Maribel filed for divorce on grounds of insupportability and cruel treatment. Maribel requested that she be appointed sole managing conservator of the child, that the trial court award her a disproportionate share of the marital estate, and that the trial court grant spousal maintenance. Maribel also requested relief of an attachment of the body of the child and the issuance of an order taking the child into her possession. Maribel asserted causes of action for assault and intentional infliction of emotional distress. In her amended petition for divorce, Maribel requested back child support and asserted claims of breach of fiduciary duty and fraud.

Luis filed a counter-petition for divorce on the grounds of insupportability, cruel treatment, and intentional infliction of emotional distress. Luis requested that the marital estate be divided in a manner the trial court deemed just and right and that he be appointed the child's managing conservator with the exclusive right to determine the primary residence of the child without regard to geographic location or, in the alternative, that the residence of the child be restricted to Hidalgo County.

A bench trial was held on January 15 and 16, 2008. The trial court admitted an inventory and appraisement of marital property from Maribel and one from Luis, and each testified regarding the values they attributed to each item listed. Both parties agreed that the following items were part of the marital estate: (1) a home on Date Palm Drive in Mercedes, Texas; (2) cash in a Texas State Bank account in Luis's name;

(3) a Ford F150 truck; (4) a 1993 Freightliner truck; (5) a 1978 Luftkin dump trailer; (6) a Dargel boat; (7) a 2001 backhoe; (8) a four-wheeler; (9) two utility trailers; (10) furniture in Maribel's possession and furniture in Luis's possession; and (11) a 2007 Lexus IS250. In addition to these items, Maribel claimed the following items were also part of the marital estate: (1) real property built on Pleasantview Drive using community funds[1]; (2) fifteen acres of land adjacent to the real property on Pleasantview Drive in Weslaco, Texas; (3) a Wells Fargo bank account in Maribel's name; (4) three Harley Davidson motorcycles; (5) a 1989 Buick Skyhawk sedan; (6) an interest in the sole proprietorship of "O.M.T. Transportation and/or O.M.T. Utilities"; (7) a gold coin collection; (8) a five-hundred-dollar bill; (9) a gun collection; (10) Maribel's wedding band, Rolex watch, and other assorted jewelry; and (11) three cemetery lots at Highland Memorial Cemetery in Weslaco, Texas.

Maribel also sought reimbursement of $244,400 against Luis's separate estate for the following: (1) community funds used to add value to the property at 1906 Pleasantview Drive; (2) Luis's alleged "waste of community assets"; and (3) Luis's alleged "use of community funds to purchase real property and put it in his mother's and sister's names." Maribel listed several community liabilities of credit card debt in her name.

On direct examination by Maribel's attorney, Luis testified that although he listed the property on Date Palm Drive as a community asset, he considered that house to be Maribel's because she bought the house after they separated. Luis acknowledged that he had $6,297 in his bank account. Luis did not know the value of the following items:

---

[1] Luis claimed that the real property and the lot were his separate property. Maribel claimed that only the lot and "shell of a house" were Luis's separate property.

(1) Ford F150 truck; (2) Freightliner; (3) Lufkin dump trailer and truck; (4) Dargel boat; (5) backhoe; (6) two four-wheelers; and (7) three utility trailers. Luis stated that he acquired his home at 1906 Pleasantview Drive as a gift from his grandmother and that his grandfather turned a garage on the property into a home. Luis claimed that improvements in the amount of $5,000 were made to the property while he was married to Maribel. Luis admitted that he had purchased and sold various vehicles during the marriage but that he had not included those items in his inventory and appraisement.

Luis stated that he only had two dirt bikes and that he did not own any other motorcycles. Luis denied ever owning a Harley Davidson motorcycle. However, Luis claimed that as a hobby, he enjoyed repairing motorcycles for his friends although, in many cases, he was unable to do the repairs; therefore, he would take the bikes to the Harley Davidson shop for repairs. According to Luis, one of his friends from Mexico owns eight Harley Davidson bikes and is unable to cross the border to take these bikes to the shop for repairs; so, Luis takes the bikes in for repairs. The trial court admitted plaintiff's exhibit number eight, a repair bill showing that Luis had paid $2300 to repair the transmission on a blue Harley Davidson bike in 2003. Luis acknowledged that he had taken the bike in for repairs and that he had paid cash, but insisted that his friend, Carlos Delgado, owned the bike. Luis explained that he did not mind paying for repairs in cash or on his credit card on behalf of his friends and family who he knew would pay him back. Luis acknowledged that he also took a red Harley Davidson and a green Harley Davidson bike in for repairs and paid the amount due with his credit card.

Luis denied that he threatened Maribel with a gun. Luis acknowledged that Maribel may have sought a restraining order against him, but denied that a restraining

4

order had ever been issued against him. Luis also claimed that Maribel "took custody" of the child. According to Luis, he had possession of the child "[e]ver since [Maribel] left in 2001" until 2004 when "that judge signed that paper and gave [Maribel] authority over [the child]." When asked if he had committed family violence against Maribel, Luis stated that he had never been arrested or charged with that crime. Maribel's counsel then stated, "Well, the question I asked you was, did you ever commit family violence against [Maribel]? Did you ever hit her?" Luis responded, "Not that I recall, no. Maybe pushed her off of me if she were to attack me or something, but hit her, no. I would guarantee you I'd be in jail or I would have been in jail, arrested. She's called the cops on me a lot of times, but I've never been locked up."

Luis agreed that he had net resources of approximately $70,000 despite the fact that on his tax returns, he claimed that his amount of income in 2004 was negative $1,255 and in 2006 was $500. Maribel's attorney presented evidence that Luis purchased a 1999 Toyota Corolla for $1,600 that had been registered to Luis's friend, Edith Cadena. Luis explained that Cadena had given him cash to purchase the vehicle and that he had then written a check.

On cross-examination, Luis testified that since the petitions for divorce had been filed in 2001, he had not resided with Maribel. According to Luis, even before the divorce had been filed, Maribel "went and came as she pleased." Luis accused Maribel of having a boyfriend the entire time they had been married. Luis acknowledged that in his petition for divorce, he stated that he and Maribel ceased living together as husband and wife on October 15, 2001.

5

On re-direct examination, Luis admitted that he had used drugs when he went through depression; however, according to Luis, he had never been addicted to drugs or ever been to rehab. Luis testified that it had been "years" since he had used drugs. Luis did not recall writing a letter to Maribel stating that he had used cocaine on Father's Day in 2002 or 2003.

Maribel testified that she filed for divorce in March 2001 and that she asked for an emergency writ of attachment because Luis allegedly "showed up" at her residence at 2:00 a.m. threatening to kill her with a gun. Maribel stated that the child was crying on the bed until 4:00 a.m. Maribel testified that she left home during the marriage because Luis allegedly committed family violence against her by threatening her, choking her, and spitting in her face. Maribel claimed she filed between fifteen and twenty police reports concerning the family violence.

Maribel stated that she denied Luis access to the child on Father's Day in 2002 or 2003 because she discovered that Luis possessed cocaine, and he sent her a letter stating that he was using drugs.[2] According to Maribel, Luis "has a habit of hanging around with the wrong crowd" and has "dealt" drugs before. Maribel stated that "a certain individual who has happened to kill someone two years ago in Weslaco" had threatened Luis's life. Maribel testified that Luis has taken the child to bars. Maribel claimed that she had to apply for a protective order against Luis in 2004 because "he kept harassing" her while she was at a Christmas party and stated, "Thank God you parked in the back because if I get to you, this and this and that." On another occasion, Luis allegedly harassed Maribel again and made several threats, stating "that Thank

---

[2] The trial court admitted the letter into evidence. In the letter, Luis also stated that he was drinking every day. Maribel testified on redirect examination that Luis still drinks every day.

6

God that you parked at this parking lot over here because—right under the light because if you come out, I'm going to do this and this and that, several threats." Maribel testified that the court granted the protective order.

Maribel testified that Luis had three Harley Davidson motorcycles worth $60,000 and that Luis's business is worth "at least" $150,000. Maribel based the value of the business on Luis's financial records, his equipment, and the profits he has received from it.[3] According to Maribel, Luis failed to account for several items that he has acquired during the marriage in his inventory, including among other things, a red tractor-trailer that he recently sold, a gun collection, and a gold coin collection. Maribel testified that the gold coin collection is worth approximately $6,000 and that the gun collection is worth approximately $15,000.

After hearing the evidence, in its final decree of divorce, the trial court granted the couple's divorce on the ground of insupportability, appointed Maribel and Luis joint managing conservators of the child, ordered that the child's primary residence be in Hidalgo County, Texas,[4] established the parents' possession and access to the child, ordered Luis to pay $500 per month in child support, and divided the marital estate.

Maribel filed a request for findings of fact and conclusions of law and when the trial court failed to issue them, she filed a notice of past due findings of fact and conclusions of law. The trial court did not issue any findings of fact or conclusions of law. This appeal ensued.

---

[3] Luis agreed that his business, including the equipment, is worth $150,000.

[4] The trial court granted Maribel the right to designate the child's residence within Hidalgo County.

On August 20, 2010, Luis filed with this Court a motion to abate the appeal and remand to the trial court for entry of findings of fact and conclusions of law. Maribel filed a response stating that she was unopposed to such motion. On August 31, 2010, this Court abated the appeal and remanded the case to the trial court so that it could issue findings of fact and conclusions of law. The trial court's findings of fact and conclusions of law were filed in this Court in a supplemental clerk's record on November 15, 2010.

## II.    DIVISION OF THE MARITAL ESTATE

By her first issue, Maribel contends that the trial court abused its discretion by its disproportionate division of the marital estate in favor of Luis. She argues that the disproportionate division was manifestly unjust and requires reversal. Luis has not filed a brief in this case.

### A.    Standard of Review and Applicable Law

We review a trial court's division of property under an abuse of discretion standard. *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981). A trial court has wide latitude in the exercise of its discretion in dividing marital property in a divorce proceeding, and that division will not be overturned on appeal unless the trial court has abused its discretion. *Id.*; *Zieba v. Martin*, 928 S.W.2d 782, 786 (Tex. App.–Houston [14th Dist.] 1996, no writ); *Dankowski v. Dankowski*, 922 S.W.2d 298, 304 (Tex. App.–Fort Worth 1996, no writ). The mere fact that a trial judge may decide a matter within his discretionary authority differently than an appellate judge is not an abuse of discretion. *Jones v. Jones*, 804 S.W.2d 623, 624 (Tex. App.–Texarkana 1991, no writ) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238 (Tex. 1985)). To constitute an abuse of discretion, the trial court's division of the property must be manifestly unfair.

*Mann v. Mann*, 607 S.W.2d 243, 245 (Tex. 1980); *Vandiver v. Vandiver*, 4 S.W.3d 300, 303-04 (Tex. App.–Corpus Christi 1999, pet. denied).

The trial court shall in its divorce decree order a division of the marital estate in a manner that it deems just and right. TEX. FAM. CODE ANN. § 7.001 (West 2006). The trial court is not required to divide the marital estate equally; however, its division must be equitable. *Zieba*, 928 S.W.2d at 790. "The trial court's discretion is not unlimited, and there must be some reasonable basis for an unequal division of the property." *O'Carolan v. Hopper*, 71 S.W.3d 529, 532 (Tex. App.–Austin 2002, no pet.). In deciding whether a reasonable basis exists for an unequal division of the marital estate, the trial court may consider "such factors as the spouses' capacities and abilities, benefits which the party not at fault would have derived from continuation of the marriage, business opportunities, education, relative physical conditions, relative financial condition and obligations, disparity of ages, size of separate estates, and the nature of the property." *Murff*, 615 S.W.2d at 699.

## B.    Discussion

In its final decree of divorce, the trial court stated that it divided the marital estate in a manner it deemed just and right. However, the final judgment does not state the values of any of the property divided and does not set out the amount of the debt each party is responsible for paying. Instead, the values of some of the property were included in the trial court's findings of fact. Although the trial court did determine the values of some of the property awarded to each party in its findings of fact, it did not provide values for all of the property awarded, and many of the values were merely

9

based on Maribel's assertions at trial. In its findings of fact, the trial court determined that the values of the property it divided are as follows:

| | |
|---|---|
| Luis's interest in the 15 acre tract of land | $20,000.00 |
| Luis's furniture | $500.00 |
| Maribel's furniture | $7,000.00 |
| Cash | $9,153.00 |
| Three Harley Davidson motorcycles | $60,000.00 |
| Ford F150 truck | $27,000.00 |
| O.M.T. and the equipment used in the business | $150,000.00 |
| Dargel boat | $2,500.00 |
| Gun collection | $15,000.00 |
| Gold coin collection and $500 bill | $6,500.00 |
| Equity in the property on Date Palm Drive | $8487.32 |
| Vehicles and trailers in Luis's possession | $7,600.00 |
| Grizzley Camouflage 4x4 4-wheeler | Unknown value |
| Maribel's IRA[5] | Unknown value |
| Vehicles in Maribel's possession | Unknown value |
| **TOTAL VALUE OF MARITAL ESTATE:** | **$313,740.32** |

Based on these findings, the value of the marital estate actually divided in the judgment was $313,740.32.

The trial court awarded Luis the property on Pleasantview Drive as his separate property. The trial court awarded Luis the following marital property[6]:

| | |
|---|---|
| His interest in the 15 acre tract of land | $10,000.00[7] |
| Furniture in his possession | $500.00 |
| Cash in his possession | $9,153.00 |

---

[5] We note that at trial, no evidence was presented that Maribel actually had an IRA or of the value of that IRA, if any.

[6] The trial court ordered Luis to pay the following debts: (1) the sum of $5,000 to Maribel for improvements made to his separate property; (2) $10,000 to Maribel for her interest in the 15 acre tract of land; (3) $3,000 to Maribel for her interest in the gold coin collection and $500 bill; (4) debts and taxes on the real property awarded to him; (5) debts on all motor vehicles and motorcycles in his possession; (6) credit card debt, if any in his name ; (7) all debts incurred solely by him; and (8) all taxes, etc., on real and personal property awarded to him. The trial court did not determine how much debt, if any, Luis owed on the real and personal property awarded to him. In the above charts, we have already accounted for the known amount of debts Luis was ordered to pay.

[7] The trial court stated that it was awarding Maribel half of Luis's interest in the 15 acre tract of land. The trial court found that Maribel should receive $10,000; therefore, Luis was awarded the other half—$10,000.

| | |
|---|---|
| Harley Davidson motorcycles | $60,000.00 |
| The Ford F150 truck | $27,000.00 |
| Vehicles and Trailers | $7,600.00 |
| The business known as O.M.T. Transportation and/or O.M.T. Utilities and equipment | $150,000.00 |
| Dargel boat | $2,500.00 |
| Grizzley Camouflage 4x4 4-wheeler | Unknown value |
| Gun collection | $15,000.00 |
| Gold coin collection and $500 bill | $3,500.00[8] |
| **TOTAL AWARDED TO LUIS:** | **$285,253.00** |

Maribel received the following marital property:

| | |
|---|---|
| Maribel's interest in the 15 acre tract of land | $10,000.00 |
| Maribel's interest in the gold coins and $500 bill | $3,000.00 |
| Palm Date property | Equity of $8487.32 |
| Furniture in Maribel's possession | $7,000.00 |
| Clothing, jewelry, and other personal effects in Maribel's possession | Unknown value |
| Cash in Maribel's possession | Unknown value |
| Maribel's IRA | Unknown value |
| All motor vehicles in Maribel's possession | Unknown value |
| **TOTAL AWARDED TO MARIBEL:** | **$28,487.32[9]** |

According to the trial court's findings of fact, it appears that Luis received $285,253.00 of the marital estate and Maribel received $28,487.32.[10]  Therefore, Maribel received 9% of the marital estate and Luis received 91% of the marital estate.  Accordingly, based on the trial court's findings of fact, the trial court divided the marital estate disproportionately in favor of Luis.

---

[8] The trial court required Luis to pay Maribel $3,000 for her interest in the gold coins and $500 bill.

[9] The trial court ordered Maribel to pay the following debts:  (1) the balance due on the promissory note in the original amount of $81,000 for the mortgage of the Date Palm property; (2) all debts on all motor vehicles in her possession; (3) taxes on any real property awarded to her; (4) credit card debt in her name; (5) all debts incurred solely by her after March 9, 2001; and (6) all taxes, etc., due on the real and personal property awarded to her.  Again, in its judgment and findings of fact, the trial court did not provide any values for the amount of debt owed by Maribel.

[10] Although, the amount of the parties' debt is a consideration in determining the division of the marital estate, we have already accounted for the amount of known debts in our analysis.  The trial court did not attribute values to the other debts it ordered the parties to pay.  Therefore, these unknown amounts do not affect our analysis.

11

In its conclusions of law, the trial court stated that Luis did not request a disproportionate division of the community estate. And, upon our review of the trial court's findings of fact and conclusions of law and the record before us, we find nothing to support an unequal division of the property in Luis's favor. *See O'Carolan*, 71 S.W.3d at 532.

Although Luis alleged in his counter petition for divorce that Maribel was guilty of cruel treatment toward him, the trial court did not make any findings that would support such a conclusion and it did not draw such a conclusion from the findings it did make.[11]

---

[11] The trial court made the following findings of fact:

8. There was evidence of family violence. [Luis] committed family violence when he and [Maribel] were together. [Luis] threatened her, choked her and spit in her face. Police were called out to the residence 15 to 20 times. There were several times [Maribel] filed police reports about guns. [Luis] showed up with a gun at least two times at [Maribel's] mother's house when [Maribel] was there.

. . . .

30. [Luis] does not know if the profits from the sales of trucks and other things he sells are indicated anywhere in the taxes.

31. [Luis] does not know how many vehicles he has purchased and does not keep records and he does not have all the vehicles records [sic] to disclose in the Inventory.

. . . .

43. [Maribel] denied [Luis] access to his son on Father's Day when [Luis] was using drugs. [Maribel] took her son from [Luis] and called the police department. [Luis] left a note on [Maribel's] doorstep admitting that he was using drugs and he was in possession of cocaine at the time.

44. [Luis] has the habit of hanging around with the wrong crowd and has dealt drugs before.

45. [Luis] has taken their son to bars. For his birthday, [Maribel's] son said he wanted a pool table because his dad takes him to shoot pool at the Jungle Inn. [Maribel] took her son out of a bar in 2001, when he was 2 ½ years old, when he was there with his father.

12

*See Murff*, 615 S.W.2d at 699 (setting out the factors the trial court may consider when awarding a disproportionate share of the marital estate to one party). The parties' ages were roughly the same, and there was no evidence that Luis had any physical or mental disabilities warranting an unequal division of the marital estate. *See id.* There is no evidence that Maribel had a separate estate, but the trial court concluded that Luis had a separate estate with a value between $40,000 and $45,000. *See id.* The record shows that Luis had a significantly higher income, earning capacity, and business opportunities, which are important factors to consider when dividing the marital estate.[12] *See id.* Disparity in earning capacity is generally a factor weighing in favor of awarding a disproportionate share of the community property to the lower income earner—here, Maribel. *O'Carolan*, 71 S.W.3d at 532-33. The couple had one child who was to live with Maribel—therefore, there was no evidence that the needs of the child provided the basis for the disproportionate award of the marital estate. Finally, there is no evidence that the nature of the property compelled an unequal distribution, especially considering that Luis did not request an unequal distribution of the marital estate. *Murff*, 615 S.W.2d at 699.

The trial court did not make any findings of fact or issue any conclusions of law regarding its basis for the unequal division of the marital estate in favor of Luis.

46. In 2004, [Maribel] obtained a Protective Order against [Luis].

47. There are major changes in the child when he returns from visitation with [Luis]. He comes back saying [Maribel] is the worst mom, calling her names, and referring to her as being fat and asks how she can afford everything she buys.

[12] The trial court found that Luis owned a business worth $150,000, that his annual income was $87,459 and that Maribel's annual income was $50,000 plus bonuses. The trial court did not state the amount of bonuses Maribel receives annually. However, she testified that she received approximately $7,000 in bonuses.

Moreover, because Maribel and Luis were still married, assuming the trial court took the separation into consideration, the property they continued to acquire between the date of separation and divorce was still considered community property, unless either party could establish that the property was separate property. *Wilson v. Wilson*, 44 S.W.3d 597, 601 (Tex. App.–Fort Worth 2001, no pet.). Luis provided no evidence that the property acquired after the separation was his separate property. *See* TEX. FAM. CODE ANN. § 3.001 (West 2006) (providing that separate property includes: (1) property owned or claimed by either spouse before marriage; (2) property acquired during marriage by gift, devise, or descent; and (3) recovery for personal injuries, except for loss of earning capacity). Moreover, the trial court did not make any findings to support a conclusion that the property should be unevenly divided because the couple had been separated.

Therefore, we cannot conclude that there is a reasonable basis for the unequal division of the property in favor of Luis in this case. *See O'Carolan,* 71 S.W.3d at 532. Accordingly, we conclude that the trial court's judgment was manifestly unfair, and it abused its discretion in its division of the marital estate. *See id.* at 532; *Mann*, 607 S.W.2d at 245; *Vandiver*, 4 S.W.3d at 303-04. We sustain Maribel's first issue.

### III. CHILD SUPPORT

By her second issue, Maribel contends that the trial court reversibly erred by deviating from the child support guidelines without justification. Maribel argues that the evidence conclusively supports a $1,000 per month child support obligation.

### A. Standard of Review and Applicable Law

14

We review a trial court's order of child support under an abuse of discretion standard. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Smith v. Smith*, 143 S.W.3d 206, 217 (Tex. App.–Waco 2004, no pet.) (applying the abuse of discretion standard to a trial court's downward deviation from child support guidelines). In deciding whether a trial court has abused its discretion, we must determine whether the court acted without reference to any guiding rules and principles. *Downer*, 701 S.W.2d at 241-42.

Section 154.130 of the family code requires a trial court ordering child support that varies from the amount computed by applying the percentage guidelines to make certain findings including: (1) whether the application of the guidelines would be unjust or inappropriate; (2) the net monthly resources of the obligor and obligee; (3) the amount of support that would result if the guidelines were followed; (4) the percentage applied by the court to the obligor's net monthly resources that yields the child-support obligation set by the court; and (5) the specific reasons why the amount ordered by the court varies from the amount called for by application of the guidelines. TEX. FAM. CODE ANN. § 154.130(a)(3), (b) (West Supp. 2010); *In re S.B.S.*, 282 S.W.3d 711, 717 (Tex. App.–Amarillo 2009, pet. denied). Such findings are mandatory and the failure to make them when required constitutes reversible error. *In re S.B.S.*, 282 S.W.3d at 717.

**B.    Discussion**

Here, Maribel timely filed her request for findings of fact and conclusions of law. After this Court abated the case and remanded it to the trial court, the trial court filed its findings of fact and conclusions of law.[13] In the findings of fact, the trial court found that

---

[13] We note that although, in its judgment, the trial court ordered Luis to pay $500 per month in child support, in its findings of fact it found that Luis's income required him to pay $1,000 per month in

15

Luis's "gross income for 2006 was $87,459.04 and his net monthly available resources is $5,002.83, which would result in a child support amount of $1,000." This amount follows section 154.125(b)'s guideline providing that an obligor who has one child should pay child support equal to twenty percent of the obligor's net resources. *See* TEX. FAM. CODE ANN. § 154.125(b) (West Supp. 2010). However, in its judgment, the trial court ordered Luis to pay $500 per month in child support. Therefore, in its judgment, the trial court varied from the amount computed by applying the percentage guidelines. *See id.* However, the trial court failed to make findings pursuant to section 154.130 regarding the monthly resources of obligee, the percentage applied by the court to the obligor's net monthly resources that yielded the child-support obligation set by the court, and the *specific reasons* why the amount ordered by the trial court varied from the amount called for by application of the guidelines. *See* TEX. FAM. CODE ANN. § 154.130(a)(3), (b) (emphasis added).

Because the trial court failed to make these required findings, we conclude that the trial court abused its discretion. *See Worford*, 801 S.W.2d at 109; *Smith*, 143 S.W.3d at 217. Accordingly, we sustain Maribel's second issue.

## IV. CHILD POSSESSION ORDER

By her third issue, Maribel contends that the trial court abused its discretion in its possession order. She argues that the trial court's order deviated from the standard possession order as provided by sections 153.311 through 153.317 of the family code.

Although Maribel cites these sections of the family code, she provides no authority stating that a trial court abuses its discretion by modifying or deviating from the

---

child support. There is nothing in the record to explain this discrepancy between the judgment and the trial court's findings of fact.

standard possession order. Therefore, she has not met her burden of showing that the trial court abused its discretion in this case. *See* TEX. FAM. CODE ANN. § 153.256 (West 2008) (providing that a trial court may deviate from the standard possession order depending on factors such as: (1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named possessory conservator; and (3) other factors). We overrule Maribel's third issue.

## V. GEOGRAPHIC RESTRICTION

By her fourth issue, Maribel contends that there was no evidence for the trial court "to determine that a geographical restriction to Hidalgo County was appropriate and in the best interest of the child."[14] Maribel argues that, pursuant to section 153.134 of the family code, the trial court "should have specified that Maribel has the right to determine the primary residence of the child without regard to geographic location." Maribel provides no other authority and makes no other arguments to support her contention.

Pursuant to section 153.134 of the family code, in rendering an order appointing joint managing conservators, the trial court shall

> designate the conservator who has the exclusive right to determine the primary residence of the child and . . . establish, until modified by further order, a geographic area within which the conservator shall maintain the child's primary residence . . . or . . . specify that the conservator may determine the child's primary residence without regard to geographic location.

---

[14] The legal and factual sufficiency of the evidence are factors which can be considered in determining whether an abuse of discretion has occurred. *In re J.C.K.*, 143 S.W.3d 131, 135 (Tex. App.–Waco 2004, no pet.); *London v. London*, 94 S.W.3d 139, 143-44 (Tex. App.–Houston [14th Dist.] 2002, no pet.).

*Id.* § 153.134(b)(1)(A) (West 2008). "[T]he purpose of imposing a geographic residency restriction is to ensure that those who have rights to possession of the child are able to effectively exercise such rights." *In re S.M.D.*, 329 S.W.3d 8, 22 (Tex. App.–San Antonio 2010, no pet.).

The trial court appointed Maribel and Luis as joint managing conservators of the child. Therefore, the trial court had authority, pursuant to section 153.134, to establish that Maribel must maintain the child's primary residence in Hidalgo County. *See Bates v. Tesar*, 81 S.W.3d 411, 440 (Tex. App.–El Paso 2002, no pet.) ("The revised language [of section 153.134] requires the court to specify which parent shall determine the residence of the child and then permits the court to establish a geographic area in which that parent shall establish the child's residence or allow the parent to establish the residence without restriction. The court may define this geographic area as 'the county in which the child is to reside and any contiguous county thereto. . . .'"). Moreover, Maribel provides no authority and points to nothing in the record supporting a conclusion that the trial court abused its discretion by imposing a geographic residency restriction. *See Stucki v. Stucki*, 222 S.W.3d 116, 123-24 (Tex. App.–Tyler 2006, no pet.) (explaining that the best interest of the child is the primary concern in determining possession and access to the child and that the trial court's order establishing a geographic restriction will only be reversed if the trial court abuses its discretion)[15]; *Bates*, 81 S.W.3d at 440 (finding that the trial court did not abuse its discretion in

---

[15] Although Maribel generally asserts that there is no evidence that a geographic restriction was in the child's best interest, she does not provide a clear argument with citation to appropriate authority in support of her assertion. *See* TEX. R. APP. P. 38.1(i).

18

establishing a geographic residency restriction).  Therefore, we overrule Maribel's fourth issue.

## VI.    CONCLUSION

We reverse the judgment insofar as it pertains to the division of the marital estate and the amount of child support, and we remand to the trial court for proceedings consistent with this opinion.  In all other respects, the judgment is affirmed.

_____<br>
ROGELIO VALDEZ<br>
Chief Justice

Delivered and filed the
30th day of June, 2011.